# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PAUL MORRIS, on behalf of all similarly situated unitholders of SPECTRA ENERGY PARTNERS, L.P., | § § § § § | No. 489, 2019 |
| | § § | Court Below – Court of Chancery of the State of Delaware |
| Plaintiff Below, Appellant, | § § § | |
| | § § | Consolidated C.A. No. 2019-0097 |
| v. | § § | |
| SPECTRA ENERGY PARTNERS (DE) GP, LP, | § § § § | |
| | § § | |
| Defendant Below, Appellee. | § § § | |

Submitted: October 28, 2020
Decided: January 22, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.


Upon appeal from the Court of Chancery. **REVERSED** and **REMANDED.**

Michael J. Barry, Esquire (*argued*) and Rebecca A. Musarra, Esquire, GRANT & EISENHOFFER P.A., Wilmington, Delaware; Peter B. Andrews, Esquire, Craig J. Springer, Esquire, and David M. Sborz, Esquire, ANDREWS & SPRINGER LLC, Wilmington, Delaware; and Jeremy S. Friedman, Esquire, Spencer Oster, Esquire, and David F.E. Tejtel, Esquire, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York; *Attorneys for Plaintiff-Appellant Paul Morris and all similarly situated unitholders of Spectra Energy Partners*, *L.P.*

Robert S. Saunders, Esquire, Ronald N. Brown, III, Esquire, Ryan M. Linsay, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Wilmington, Delaware; Noelle M. Reed, Esquire (*argued*) and Daniel S. Mayerfeld, Esquire, SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP, Houston, Texas; *Attorneys for Defendant-Appellee Spectra Energy Partners (DE) GP*, *LP*.

**SEITZ**, Chief Justice:

With limited exceptions, a merger extinguishes an equity owner's standing to pursue a derivative claim against the target entity's directors or controller. But the same plaintiff has standing to pursue a post-closing suit if they challenge the validity of the merger itself as unfair because the controller failed to secure the value of a material asset—like derivative claims that pass to the acquirer in the merger. Given the difficulties of pursuing such claims, not the least of which is proof that the equity owner received an unfair merger price for their ownership interest, the plaintiff might not prevail on the merits, but they have sufficiently alleged a direct claim to survive a motion to dismiss for lack of standing.

After a $3.3 billion "roll up" of minority-held units involving a merger between Enbridge, Inc. ("Enbridge") and Spectra Energy Partners L.P. ("SEP"), Paul Morris, a former SEP minority unitholder, lost standing to litigate an alleged $661 million derivative suit on behalf of SEP against its general partner, Spectra Energy Partners (DE) GP, LP ("SEP GP"). Morris reprised the derivative claim dismissal by filing a new class action complaint that alleged the Enbridge/SEP merger exchange ratio was unfair because SEP GP agreed to a merger that did not reflect the material value of his derivative claims.

The Court of Chancery granted SEP GP's motion to dismiss the new complaint for lack of standing. The court held that, to have standing to bring a

2

post-merger claim, Morris had to allege a viable and material derivative claim that the buyer would not assert and provided no value for in the merger. Focusing on the materiality requirement, the court first discounted the $661 million recovery to $112 million to reflect the public unitholders' beneficial interest in the derivative litigation recovery. Then, the court discounted the $112 million further to $28 million to reflect what the court estimated was a one in four chance of success in the litigation. After the discounting, the $28 million—less than 1% of the merger consideration—was immaterial to a $3.3 billion merger.

On appeal, Morris argues that the court should not have dismissed the plaintiff's direct claims for lack of standing. We agree with Morris and find that, on a motion to dismiss for lack of standing, he has sufficiently pled a direct claim attacking the fairness of the merger itself for SEP GP's failure to secure value for his pending derivative claims. Thus, we reverse the Court of Chancery's judgment and remand for further proceedings.

## I.

The plaintiff, Paul Morris, owned common units of SEP, a master limited partnership that traded on the New York Stock Exchange.[1] Enbridge owned 83% of

---

[1] We take the facts from the complaint and the Court of Chancery's decision. *Morris v. Spectra Energy Partners (DE) GP, LP*, 2019 WL 4751521 (Del. Ch. Sept. 30, 2019).

SEP's outstanding units through a series of wholly-owned subsidiaries, including SEP GP.[2] Spectra Energy Corp ("SE Corp") was Enbridge's predecessor-in-interest.

Prior to selling to Enbridge, SE Corp agreed to a 50-50 joint venture with Phillips 66 whereby Phillips would contribute $1.5 billion and SE Corp would contribute a one-third interest in two long haul natural gas pipelines, implying a $1.5 billion valuation of the contributed assets. Because SEP owned the assets, the parties proposed a "reverse dropdown" to sell the assets from SEP to SE Corp. To purchase the assets from SEP, SE Corp offered to "(i) surrender 20 million SEP limited partner units to SEP for redemption . . . and (ii) waive its right to receive up to $4 million in incentive distribution rights [] for twelve consecutive quarters . . . ."[3] SEP GP authorized a conflicts committee to evaluate the reverse dropdown.

SEP's limited partnership agreement required the general partner's conflicts committee to act in "subjective good faith."[4] According to the complaint's allegations, a financial advisor identified three ways the transaction would provide value to SEP: the redeemed units, the waived distribution rights, and other reduced cash flow due to the loss of assets. Later, however, the adviser included only the first two components as consideration—valued at $946 million—and issued a

---

[2] Enbridge owned Spectra Energy Partners GP, LLC, which owned SEP GP.
[3] *Morris*, 2019 WL 4751521, at *3.
[4] *Id*. A "good faith" finding requires that "the person acting 'must believe that the determination or other action is in the best interests of the Partnership.'" *Id*. (citation omitted).

4

fairness opinion. The conflicts committee recommended approval, and SEP GP's board approved the reverse dropdown.

After reviewing SEP's books and records, the plaintiff filed a class action derivative complaint on behalf of all owners of SEP public units against SEP GP and SE Corp. The complaint alleged that SEP only received $946 million in the reverse dropdown when SE Corp valued the assets at $1.5 billion. Morris pleaded three derivative claims, including a claim for breach of the limited partnership agreement's "good faith" obligation in approving the reverse dropdown.[5] The court dismissed two of the claims for failure to state a claim, but declined to dismiss the breach of the "good faith" obligation claim. The court found, after drawing all reasonable inferences in Morris's favor, that the complaint "made adequate allegations showing that under reasonably conceivable circumstances a facially unreasonable gap in consideration exists sufficient to infer subjective bad faith."[6] According to the court, "it was 'reasonably conceivable that the General Partner acted in subjective bad faith.'"[7] The parties conducted discovery and SEP GP moved for summary judgment. During the litigation, and with the motion summary

_____

[5] The plaintiff also pled breach of the implied covenant of good faith and fair dealing against SEP GP and tortious interference with the limited partnership agreement against SEP Corp.
[6] *Morris*, 2019 WL 4751521, at *5 (quoting *Morris v. Spectra Energy Partners (DE) GP, LP*, 2017 WL 2774559, at *16 (Del. Ch. June 27, 2017)).
[7] *Id.*

judgment pending, Enbridge acquired SE Corp in a stock-for-stock merger, becoming SEP GP's ultimate parent and controller of SEP.

In March 2018, SEP's stock price declined by twenty percent in reaction to announcements from the Federal Energy Regulatory Commission ("FERC"). SEP recognized in its filings with the U.S. Securities and Exchange Commission that "[t]he change in FERC's policy has had a negative impact on the MLP sector" and that SEP "would attempt to mitigate the impact of the policy change."[8] In May, Enbridge offered a stock-for-stock exchange to buyout SEP's public unitholders. SEP's public unitholders would receive 1.0123 common shares of Enbridge in exchange for each publicly held common unit of SEP based on the SEP common units' and Enbridge common shares' closing price on the NYSE as of May 16, 2018. SEP closed at a unit price of $33.10 and Enbridge common shares closed at $32.70. According to the plaintiff, this was an opportunistic offer to squeeze out the public unitholders due to an artificially depressed trading price. Another three-member SEP GP conflicts committee went to work, two of whom were on the committee that reviewed the reverse dropdown transaction.

---

[8] *Id.* at *6 (alteration in original). Later, however, and "contrary to initial expectations," "it did not 'meaningfully limit an MLP's ability to recover an income tax allowance in its cost of service.'" *Id.* at *7. (quoting Compl. ¶ 57). "SEP's public units realized a corresponding increase in market price." *Id.*

Morris's counsel sent a letter to the conflicts committee and told them that the derivative claim was worth more than $500 million and must be taken into account when negotiating the merger exchange ratio. Counsel also noted that the proposed offer was "woefully inadequate" and "fail[ed] to provide SEP and its public unitholders with any value associated with" the derivative claim.[9] After Morris's counsel met with the conflicts committee's legal and financial advisors, the conflicts committee ultimately determined that the value of the derivative claim, net of defense costs, "was less than $0."[10] The conflicts committee also found the value of the reverse dropdown to SEP to be about $1.5 billion after adding back the reduced distributions its advisor previously excluded.

As the parties negotiated the buyout, the conflicts committee decided to give no value to the derivative claim but attributed $4 million in saved litigation costs. They also agreed to an exchange ratio "whereby Enbridge would acquire all publicly held SEP units at an exchange ratio of 1.111 shares of Enbridge stock for each publicly held unit of SEP."[11] On August 24, 2018, SEP announced a definitive merger agreement with Enbridge and its wholly-owned subsidiaries where Enbridge would acquire all publicly held SEP units at an exchange ratio of 1.111 shares of Enbridge stock for each publicly held unit of SEP. The transaction was not subject

---

[9] *Id*. at *6 (quoting the record).
[10] *Id*. at *8.
[11] *Id*. at *9 (citation omitted).

to approval by a majority of the minority unitholders. The transaction was approved on December 13, 2018. At that time, Enbridge affiliates held about 83% of the outstanding units. About 39% of publicly held units voted in favor of the transaction. After the deal closed, the court dismissed the derivative claim by stipulation of the parties.[12]

After another books and records request, Morris filed this class action on February 8, 2019 against SEP GP, as SEP's general partner, for breaching SEP's limited partnership agreement and the implied covenant of good faith and fair dealing. Morris claimed that the conflicts committee and SEP GP's board of directors failed to attribute appropriate value to the pre-merger derivative claim or secure any value for the claim. SEP GP moved to dismiss for lack of standing and failure to state a claim.

The Court of Chancery dismissed Morris's complaint for lack of standing without reaching the arguments for failure to state a claim. The court applied the three-part test from its decision in *In re Primedia, Inc. Shareholders Litigation*.[13] The *Primedia* test applies to claims challenging a merger because the equity owners are not being fairly compensated for the value of material derivative claims. To establish standing the plaintiff must allege a viable derivative claim, that is material

---

[12] The Order dismissing the derivative claim "did not preclude the Plaintiff from prosecuting this Action." *Id*. at *9.
[13] 67 A.3d 455 (Del. Ch. 2013).

8

to the overall transaction, and will not be pursued by the buyer and is not reflected in the merger consideration.[14]

The court found Morris's derivative claim viable because it had already survived a motion to dismiss.[15] Also, the parties did not dispute that SEP's public unitholders received no value for the derivative claim, Enbridge did not intend to pursue the derivative claims post-merger, and Morris pled damages of $661 million. But the court dismissed Morris's two direct claims. First, the court discounted the $661 potential recovery to $112 million to reflect the public unitholders' proportionate share of the litigation recovery. And second, the court discounted the $112 million further to about $28 million to reflect a one-in-four chance of prevailing in the litigation. Finally, the court compared the $28 million to the $3.3 billion merger transaction and found it immaterial. Thus, the court granted SEP GP's motion to dismiss for lack of standing without reaching SEP GP's alternative argument that Morris failed to state a claim for relief.

## II.

On appeal the parties have focused their attention on the Court of Chancery's application of its *Primedia* decision to assess standing. To reiterate, under *Primedia*'s three-part test, which applies to claims alleging an unfair merger because

---

[14] *Morris*, 2019 WL 4751521, at *11.
[15] *Id*. at *12 ("*Primedia* asks whether the claim has 'survived a motion to dismiss.' The answer for the Derivative Claim is in the affirmative. That is the end of the viability inquiry.").

the price does not reflect the value of derivative claims, the plaintiff must allege a viable derivative claim assessed by a motion to dismiss standard.[16] The plaintiff must also allege that the derivative claim was material to the overall merger transaction, will not be pursued by the buyer, and is not reflected in the merger consideration.[17]

According to Morris, the Court of Chancery should not have dismissed his complaint for lack of standing because he pled in detail a direct claim that satisfied the *Primedia* factors. The parties and the court agreed that the derivative claim was viable because it had survived a motion to dismiss. They also agreed that Enbridge would not assert the claim and provided no value for the claim in the exchange ratio. And, as Morris alleged, the $112 million potential recovery was material to the $3.3 billion transaction. According to Morris, if the Court of Chancery had accepted his well-pleaded factual allegations as true and drawn all reasonable inferences in his favor, it would not have discounted the potential value of the claim such that it became immaterial to the merger value.

The defendants counter that Morris supposedly did not challenge the fairness of the exchange ratio, undermining the claim that SEP GP did not negotiate fair

---

[16] *Primedia*, 67 A.3d at 477 ("First, the plaintiff must plead an underlying derivative claim that has survived a motion to dismiss or otherwise could state a claim on which relief could be granted.").
[17] *Id.*

10

consideration for the public unitholders' SEP units. For the litigation discount issue, the defendants contend that Morris conceded in the Court of Chancery that the derivative claim should be discounted for litigation risk. The defendants also argue that discounting for litigation risk is consistent with prior cases.[18] And, according to the defendants, the "fraud exception to the continuous ownership rule" is the proper method to assess the plaintiff's standing to assert post-merger claims.[19]

We review *de novo* the Court of Chancery's finding that the plaintiff lacked standing to pursue his post-merger claims challenging the fairness of the merger consideration for failure to recoup some or all of the value of the derivative claims.[20]

A.

The Court of Chancery dismissed Morris's complaint for lack of standing. Standing "refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or redress a grievance."[21] Standing is required to "ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the exercise of the court's judicial powers."[22] It allows Delaware courts, "as a matter of self-

---

[18] As they argue, "the legal principle of whether a court should adjust for risk when valuing a derivative claim does not turn on the nature and degree of that risk. It is either appropriate to risk adjust or it is not." Answering Br. at 32. And they assert Delaware law supports their position in other contexts. *Id*. at 32–33 (citing *ONTI, Inc. v. Integra Bank*, 751 A.2d 904 (Del. Ch. 1999); *Bomarko*, *Inc. v. Int'l Telecharge*, *Inc*., 794 A.2d 1161 (Del. Ch. 1999), *aff'd*, 766 A.2d 437 (Del. 2000)).

[19] Answering Br. at 35.

[20] *El Paso Pipeline GP Co*., *L.L.C. v. Brinckerhoff*, 152 A.3d 1248, 1256 (Del. 2016).

[21] *Stuart Kingston*, *Inc. v. Robinson*, 596 A.2d 1378, 1382 (Del. 1991) (citation omitted).

[22] *Dover Historical Soc'y v. City of Dover Planning Comm'n*, 838 A.2d 1103, 1110 (Del. 2003).

restraint," to "avoid the rendering of advisory opinions at the behest of parties who are mere intermeddlers."[23]  "[S]tanding is properly a threshold question that the Court may not avoid."[24]

The standing inquiry "has assumed special significance in the area of corporate law."[25]  Classifying a claim as either direct or derivative bears directly on standing and is in many ways outcome-determinative in post-merger litigation.[26]  If a plaintiff alleges a direct claim, it means that the equity owner has alleged that they have suffered the injury, and will receive the benefit of any recovery.[27]  Thus, at least at the pleading stage, the plaintiff has met the injury-in-fact requirement and properly invoked the court's jurisdiction to redress an injury.

In contrast, for a derivative action, the equity owner acts in a representative capacity on behalf of an entity.  In that representative capacity, the plaintiff steps into the shoes of the entity and asserts the injury on its behalf.[28]  If the equity holder has successfully jumped over 8 *Del. C.* § 327 of the Delaware General Corporation

---

[23] *Ala. By-Prods. Corp. v. Cede & Co. on Behalf of Shearson Lehman Bros., Inc.*, 657 A.2d 254, 264 (Del. 1995) (quoting *Stuart Kingston*, 596 A.2d at 1382).
[24] *Gerber v. EPE Hldgs. LLC*, 2013 WL 209658, at *12 (Del. Ch. Jan. 18, 2013) ("If there is no standing, there is no justiciable substantive controversy.").
[25] *Ala. By-Prods.*, 657 A.2d at 264.
[26] *See Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1036 (Del. 2004) ("The decision whether a suit is direct or derivative may be outcome-determinative.").
[27] *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1245 (Del. 1999) ("Stockholders may sue on their own behalf (and, in appropriate circumstances, as representatives of a class of stockholders) to seek relief for direct injuries that are independent of any injury to the corporation.").
[28] *Id.* ("A derivative claim is one that is brought by a stockholder, on behalf of the corporation, to recover for harms done to the corporation.").

Law, Court of Chancery Rule 23.1, and our decisional law hurdles, standing exists to pursue a derivative claim on behalf of the entity.[29] But, under *Lewis v. Anderson*,[30] the equity owner no longer has standing to pursue derivative claims post-merger except in two instances—when the merger itself is the subject to a fraud claim, perpetrated to deprive shareholders of their standing to bring or maintain a derivative action; and when the merger is essentially a reorganization that does not affect the equity owner's relative ownership in the post-merger enterprise.[31]

The Supreme Court and the Court of Chancery are frequently called upon to draw the dividing line between direct and derivative claims following a merger. Our recent decision in *El Paso Pipeline GP Co., L.L.C. v. Brinckerhoff*[32] is particularly relevant here, as it addressed standing following a merger in the context of a master limited partnership. In *El Paso*, the plaintiff filed derivative claims on behalf of the limited partnership against the general partner claiming that the limited partnership substantially overpaid for the assets in a transaction. While the derivative suits were

---

[29] *Ala. By-Prods.*, 657 A.2d at 264 ("For example, in order to have standing to initiate a shareholder derivative suit, a plaintiff must have been a shareholder at the time of the challenged transaction, as well as at the commencement of suit. In addition, this Court has held that a plaintiff must also maintain his shareholder status throughout the derivative litigation."); *see also Urdan v. WR Capital Partners, LLC*, --- A.3d ----, 2020 WL 7223313, at *8 (Del. Dec. 8, 2020) (recognizing that a stockholder who is involuntarily forced to sell their stock in a merger maintains the right to assert post-merger direct claims as an exception to the continuous ownership rule).

[30] 477 A.2d 1040 (Del. 1984).

[31] *Feldman v. Cutaia*, 951 A.2d 727, 731 & n.20 (Del. 2008) ("It is now well established that a plaintiff may avoid dismissal of his derivative claims following a merger in only two distinct circumstances: where the claims asserted are direct, rather than derivative, or where one of the exceptions recognized in *Lewis v. Anderson* applies.").

[32] 152 A.3d 1248 (Del. 2016).

13

pending, the limited partnership was acquired in a merger. Although the Court of Chancery recognized that a merger typically results in the plaintiff losing standing to pursue pending derivative claims, it characterized the plaintiff's claims as both direct and derivative, circumventing the post-merger standing impediment. The court also held that, even if the plaintiff's claims were purely derivative, they survived the merger because dismissal would leave the minority equity owners without a remedy for the general partner's unfair dealing.

On appeal, this Court reversed. First, we noted that standing in corporate cases is a threshold inquiry because it implicates the exercise of the court's jurisdiction.[33] We observed that derivative standing is a "creature of equity" that allows a court of equity to hear claims by equity owners "to prevent a complete failure of justice on behalf of the corporation."[34] We also viewed standing as a fluid concept, that can change as a result of "a myriad of subsequent legal or factual causes that occur while the litigation is in progress" such as the loss of the plaintiff's status

---

[33] *El Paso*, 152 A.3d at 1256 ("Standing is therefore properly viewed as a threshold issue to 'ensure that the litigation before the tribunal is a "case or controversy" that is appropriate for the exercise of the court's judicial powers.'") (quoting *Dover Historical Soc'y*, 838 A.2d at 1110).
[34] *Id*. (quoting *Schoon v. Smith*, 953 A.2d 196, 202, 208 (Del. 2008)).

14

as an equity holder.[35]  If standing is lost, "the court lacks the power to adjudicate the matter, and the action will be dismissed as moot unless an exception applies."[36]

Second, we held that the plaintiff brought his claims as derivative claims, and his claims remained derivative claims throughout the litigation.  Even though the plaintiff's derivative claims involved a limited partnership, where most rights are governed by agreement rather than fiduciary duties, our Court held that *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,[37] and its two-part test for drawing a line between direct and derivative claims, applied.[38]  Under *Tooley*, the court must answer two questions: "[w]ho suffered the alleged harm—the corporation or the suing stockholder individually," and "who would receive the benefit of the recovery or other remedy?"[39]  In *El Paso*, we found under *Tooley* that the limited partnership

---

[35] *Id.* (quoting *Gen. Motors Corp. v. New Castle Cty.*, 701 A.2d 819, 824 (Del. 1997)).  As we recognized in *Lewis v. Anderson*, with limited exception, "[a] plaintiff who ceases to be a shareholder, whether by reason of a merger or for any other reason, loses standing to continue a derivative suit."  477 A.2d at 1049; *see also El Paso*, 152 A.3d at 1265 ("This rule flows from the fact that, following a merger, 'the derivative claim—originally belonging to the acquired corporation—is transferred to and becomes an asset of the acquiring corporation as a matter of statutory law.'") (citation omitted).

[36] *El Paso*, 152 A.3d at 1256–57.

[37] 845 A.2d 1031 (Del. 2004).

[38] *El Paso*, 152 A.3d at 1260 ("Because Brinckerhoff's claim sounds in breach of a contractual duty owed to the Partnership, we employ the two-pronged *Tooley* analysis to determine whether the claim 'to enforce the [Partnership's] own rights must be asserted derivatively' or is dual in nature such that it can proceed directly.") (alteration in original) (quoting *Loral Space & Commc'ns, Inc. v. Highland Crusader Offshore Partners, L.P.*, 977 A.2d 867, 868 (Del. 2009)).

[39] 845 A.2d at 1035.  It is worth noting that under *Tooley*, a claim can—in certain circumstances—be considered a dual-natured claim, *i.e.*, one that is both direct and derivative.  *El Paso*, 152 A.3d at 1262 ("In unique circumstances, this Court has recognized that some claims can be dual-natured—that is, both direct and derivative.").

15

suffered the harm and would benefit from any recovery. Thus, the plaintiff's claims were purely derivative, and under *Lewis v. Anderson* the derivative claims passed to the buyer following the merger. The plaintiff no longer had standing to pursue the derivative claims.

Finally, and directly relevant to this appeal, we recognized in *El Paso* that, even though the plaintiff lost standing to pursue derivative claims post-merger, a narrow avenue of relief was still available to the plaintiff—a direct claim challenging the validity of the merger when the general partner failed to secure the value of material derivative claims in the merger for the minority equity owners:

> Under our law, equity holders confronted by a merger in which derivative claims will pass to the buyer have the right to challenge the merger itself as a breach of the duties they are owed. In many cases, it might be difficult to allege that the value they are receiving in the merger is unfair simply as a result of the failure to consider value associated with their derivative suit. But that reality may also suggest that, even according full value to the potential recovery in the derivative suit (rarely a guarantee), the plaintiffs still received fair value in the merger. . . . The derivative plaintiff's recourse was to file a money damages challenge to the merger and prove that the failure to accord value to the limited partnership in the merger was somehow violative of his rights.[40]

In reaching this conclusion, we relied on our decision in *Parnes v. Bally Entertainment Corp.*[41] In *Parnes*, the plaintiff alleged that in negotiations between Bally Entertainment Corp. and Hilton Hotels Corp., the CEO's actions—requiring a

---

[40] *El Paso*, 152 A.3d at 1251–52.
[41] 722 A.2d 1243 (Del. 1999).

bribe of "several substantial cash payments and asset transfers" before consenting to a merger—resulted in the stockholders receiving an unfair price.[42] After the merger closed, the Court of Chancery found the claim derivative and dismissed the complaint for lack of standing. We reversed, finding that the complaint "directly challenges the fairness of the process and the price in the Bally/Hilton merger."[43]

We distinguished the direct claim attacking the merger itself from the derivative claim in *Kramer v. Western Pacific Industries*.[44] In *Kramer*, the plaintiff alleged "wrongful transactions associated with the merger (such as the award of golden parachutes) [that] reduced the amount paid to [the target's] stockholders," but "did not allege that the merger price was unfair or that the merger was obtained through unfair dealing."[45] Our Court held that the complaint stated only a derivative claim for mismanagement.[46] Although the plaintiff alleged that wrongful transactions associated with the merger reduced the amount paid to the target's stockholders, "it did not allege that the merger price was unfair or that the merger was obtained through unfair dealing."[47] That "such a claim is asserted in the context of a merger does not change its fundamental nature."[48]

---

[42] *Id.* at 1246.
[43] *Id*. at 1245.
[44] 546 A.2d 348 (Del. 1988).
[45] *Parnes*, 722 A.2d at 1245.
[46] *See Kramer*, 546 A.2d at 353.
[47] *Parnes*, 722 A.2d at 1245.
[48] *Id.*

Thus, in *Kramer* what the plaintiff failed to plead was a challenge to the merger itself rather than attack the side benefits secured by some merger participants. After *Parnes*, "to state a direct claim with respect to a merger, a stockholder must challenge the validity of the merger itself, usually by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price."[49] Finally, in *Parnes* we separated the standing inquiry from whether the complaint states a claim for relief.[50] After reversing the court on standing, we also reversed the court's conclusion that the complaint failed to state a claim under Rule 12(b)(6) because the complaint alleged sufficient facts of unfairness to overcome business judgment rule review.[51]

B.

As noted in *Parnes*, "it is often difficult to determine whether a stockholder is challenging the merger itself, or alleged wrongs associated with the merger . . . ."[52] After *Parnes*, the Court of Chancery was left to fill in the details. It was not an easy assignment. In *Golaine v. Edwards*,[53] the plaintiff challenged a $20 million payment to Kohlberg Kravis Roberts & Co., L.P. ("KKR") made in connection with a merger

---

[49] *Id.*

[50] *See id.* at 1246 ("Although we conclude that the Parnes complaint directly challenges the Bally merger, it does not necessarily follow that the complaint adequately states a claim for relief.").

[51] *See id.* 1247 ("Using [the pleadings stage] standard, we find that the complaint states a claim challenging the fairness of the Bally/Hilton merger and challenging the Bally directors' approval of the merger as having lacked a rational basis.").

[52] *Id.* at 1245.

[53] 1999 WL 1271882 (Del. Ch. Dec. 21, 1999).

between The Gillette Company and Duracell International, Inc. KKR's affiliate, KKR Associates, L.P., owned 34% of Duracell's outstanding common stock. The defendants filed a motion to dismiss and claimed that Golaine's challenge to the $20 million payment was a derivative rather than direct claim because the plaintiff failed to allege that the merger terms were tainted by the $20 million fee. In granting the defendants' motion to dismiss, the court concluded that the fee did not taint the merger negotiation process or the merger terms. Thus, the transaction was not unfair to Duracell's non-KKR stockholders, and the plaintiff failed to state an individual claim. It also held that the complaint failed to plead facts rebutting the business judgment rule's presumptive applicability to the Duracell board's decision to award KKR the fees or plead facts to support a waste claim.

In applying *Parnes*, the court in *Golaine* focused less on standing and more on the merits of a post-merger direct claim, and remarked about how the two inquiries overlap at times:

> the derivative-individual distinction as articulated in *Parnes* is revealed as primarily a way of judging whether a plaintiff has stated a claim on the merits. . . . *Parnes* can be straightforwardly read as stating the following basic proposition: a target company stockholder cannot state a claim for breach of fiduciary duty in the merger context unless he adequately pleads that the merger terms were tainted by unfair dealing. If the plaintiff cannot meet that pleading standard, then he has simply not stated a claim under Rule 12(b)(6). This merits focus of *Parnes* is, in my view, a more candid approach that places primary emphasis on whether compensable injury to the target stockholders is alleged rather than on whether the target stockholder's complaint has articulated only

19

a waste or mismanagement claim for which there is likely no proper plaintiff on earth.[54]

In *In re Massey Energy Co. Derivative & Class Action Litigation*,[55] stockholders of a coal mining corporation filed derivative suits against the board and company officers for lack of oversight and to hold them responsible for the financial harm from a tragic mine disaster. While the derivative suits progressed, Massey's board entered into a merger agreement with another mining company. The plaintiffs sought a preliminary injunction to prevent the merger from closing, claiming that the Massey Board should have negotiated to have the derivative claims transferred into a litigation trust for the benefit of Massey stockholders. According to the plaintiffs, the merger was unfair because it allowed the buyer to acquire Massey without paying fair value for the value of the derivative claims.

While the merger had not yet closed and the court viewed the case through a preliminary injunction lens, the court had to grapple with the value of derivative claims and the loss of standing to pursue them once the merger closed.[56] First, the court found the *Caremark*[57] claims against the defendants viable. Second, and fatal

---

[54] *Id.* at *7 (footnotes omitted).

[55] 2011 WL 2176479 (Del. Ch. May 31, 2011).

[56] In *Massey*, the plaintiffs sought to enjoin the merger or create a litigation trust pre-closing to hold the derivative claims.

[57] *In re Caremark Int'l. Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996). *Caremark* claims govern director oversight liability, which require a plaintiff to show that "(a) the directors utterly failed to implement any reporting or information system or controls; *or* (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone ex rel.*

to the plaintiffs' preliminary injunction claim, the court found that a best-case successful recovery of $95 million was immaterial to an $8.5 billion merger. Thus, given the relative immateriality of the derivative claims, the court was not persuaded on a preliminary injunction record that the merger would likely be found to be economically unfair to the Massey stockholders for failing to capture the value of the derivative claims. Importantly, the court did not couch its ruling on standing grounds. Instead, the court found that the plaintiff had failed to demonstrate a likelihood of success on the merits to earn a preliminary injunction enjoining the merger.

After *Golaine* and *Massey*, the Court of Chancery in *Primedia* gathered the strands of these and other post-*Parnes* cases and knitted them together into a three-part test. In *Primedia*, the plaintiffs filed a derivative action on Primedia Inc.'s behalf and alleged that KKR traded on inside information in a 2002 preferred stock purchase. They sought disgorgement of KKR's profits under *Brophy v. Cities Service Co.*[58] While they litigated the derivative case, Primedia, Inc. merged with a

---

*AmSouth Bancorp. v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (emphasis in original). "Because of the difficulties in proving bad faith director action, a *Caremark* claim is 'possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment.'" *City of Birmingham Ret. & Relief Sys. v. Good*, 177 A.3d 47, 55 (Del. 2017) (quoting *In re Caremark*, 698 A.2d at 967).

[58] 70 A.2d 5 (Del. Ch. 1949). *Brophy* and its progeny recognize a cause of action for a plaintiff to recover for misuse of confidential corporate information, which requires a plaintiff to demonstrate that "1) the corporate fiduciary possessed material, nonpublic company information; and 2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." *In re Oracle Corp. Deriv. Litig.*, 867

private equity entity. The plaintiffs then filed a class action suit and alleged that the merger terms were unfair because the Primedia directors failed to obtain any value for the *Brophy* claim. They also argued that the merger conferred a special benefit on KKR because KKR knew any acquirer was unlikely to pursue the *Brophy* claim post-merger. The special benefit, according to the plaintiffs, required court review of the merger under entire fairness.

Recognizing that the post-merger class action complaint required application of the *Parnes* decision, on a motion to dismiss the Court of Chancery read *Parnes* to require first an inquiry into standing, and second, an evaluation of the merits of the claims.[59] Drawing from the court's *Golaine* and *Massey* decisions, the court distilled the standing inquiry into a three-part test:

> A plaintiff claiming standing to challenge a merger directly under *Parnes* because of a board's alleged failure to obtain value for an underlying derivative claim must meet a three part test. First, the plaintiff must plead an underlying derivative claim that has survived a

A.2d 904, 934 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005) (TABLE); *see also Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 840 (Del. 2011) ("*Brophy* focused on the public policy of preventing unjust enrichment based on the misuse of confidential corporate information.").

[59] *Primedia*, 67 A.3d at 477 ("As I understand the framework established by *Parnes*, a plaintiff wishing to assert such a claim must first establish standing to sue. If standing exists, then the plaintiff must still plead a viable claim."); *see also In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2018 WL 3120804, at \*14 (Del. Ch. June 25, 2018) ("Having held that the Plaintiffs have standing to sue under *Parnes*, I next consider whether the Complaint states viable claims for breach of fiduciary duty."), *aff'd sub nom. IDT Corp. v. JDS1, LLC*, 206 A.3d 260 (Del. 2019) (TABLE); *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 755133, at \*6 (Del. Ch. June 26, 2001) ("Thus, by putting fairly before the Court the contention that [the plaintiffs] are challenging the fairness of the merger price or the merger process, Plaintiffs can survive the derivative-individual obstacle yet still fail to assert a claim that would allow them to move beyond a Rule 12(b)(6) confrontation.").

motion to dismiss or otherwise could state a claim on which relief could be granted. Second, the value of the derivative claim must be material in the context of the merger. Third, the complaint challenging the merger must support a pleadings-stage inference that the acquirer would not assert the underlying derivative claim and did not provide value for it.[60]

The Court of Chancery found the *Brophy* derivative claim viable because it would survive a motion to dismiss. For the materiality requirement, the court found potential recoverable damages of $190 million plus substantial prejudgment interest, which was material when compared to the $330 million merger. The court also noted that the amounts were material even if discounted to reflect the minority stockholders' beneficial interest in the litigation recovery. Primedia's minority stockholders owned 42% of its outstanding stock. Their *pro rata* share of the merger consideration was $133 million. Their *pro rata* share of a $190 million recovery on the *Brophy* claim would be $80 million.

In a parting comment illustrating the materiality of the derivative claims, the court risk-adjusted the potential recovery and found it material in relation to the proceeds the minority would receive in the merger:

> Clearly there is risk in the litigation, and to succeed, plaintiffs will have to prove materiality and *scienter*. These challenges, however, are not similar to those that led Chancellor Strine in *Massey Energy* to discount so heavily the value of the derivative claims. If I assume prevailing on the *Brophy* claim was a toss-up, or even a 1–in–5 proposition, the risk-adjusted, pre-interest recoveries for the minority of $40 million and $16

---

[60] *Primedia*, 67 A.3d at 477.

million, respectively, remain material when compared to their $133 million share of the proceeds from the Merger.[61]

After finding that the derivative claims were viable and material, the court also found that the acquirer would not assert the *Brophy* claim post-merger and provided no value for it in the merger consideration. Turning to whether the plaintiffs stated a claim for relief, the court held that it was reasonably conceivable that KKR received a special benefit in the merger because no acquirer likely would have pursued the *Brophy* claim post-merger, and the defendants did not extract value for or take steps to preserve the *Brophy* claim. Thus, the entire fairness standard of review applied to the merger, and the plaintiffs alleged sufficient grounds that the merger was not entirely fair.[62]

C.

In this appeal the procedural issues do not warrant lengthy discussion. After a review of the record, we are satisfied that Morris preserved for appeal a challenge to the fairness of the merger itself, and SEP GP disputed how the court should consider litigation risk when assessing materiality. Morris alleged that former public unitholders were harmed because "SEP GP has allowed Enbridge to engineer the Roll-Up Transaction on terms that were patently unfair and unreasonable to SEP and

---

[61] *Id.* at 483 (emphasis in original).
[62] The Court of Chancery has since followed *Primedia* in the context of post-merger challenges. *See In re Riverstone Nat'l, Inc. S'holder Litig.*, 2016 WL 4045411, at *8 (Del. Ch. July 28, 2016); *Houseman v. Sagerman*, 2014 WL 1600724, at *10–13 (Del. Ch. Apr. 16, 2014).

its public unitholders, and that could not have been approved in good faith by the New Conflicts Committee or the SEP GP Board."[63] Specifically, Morris pled that "the New Conflicts Committee and the SEP GP Board utterly failed to attempt to (i) appropriately value the Derivative Claim, or (ii) secure any value for the Derivative Claim in its negotiations concerning the Roll-Up Transaction."[64] SEP GP also argued that Morris's chance of prevailing on the derivative claims was a "toss-up" or a "one-in-five" chance, essentially copying the odds from the *Primedia* decision.[65] Thus, the parties preserved their appellate arguments about materiality.

The main issue on appeal is whether the Court of Chancery stayed true to the standard of review on a motion to dismiss for lack of standing. In other words, did the court accept as true all reasonable factual allegations in the complaint and consider whether it was reasonably conceivable that Morris asserted a direct claim that could lead to a $661 million recovery on the derivative claims? After our review of the complaint, we find that the court strayed from the proper standard of review, and Morris had standing to pursue his post-merger complaint.

---

[63] App. to Opening Br. at A077 (Compl. ¶ 105).
[64] *Id.*
[65] *See id.* at A0122 (Defendant Spectra Energy Partners (DE) GP, LP's Opening Br. in Support of its Mot. to Dismiss the Verified Class Action Compl. at 31 n.12) ("For instance, if the derivative claim were considered a toss-up, a theoretical $47 million recovery (without interest) would represent just 1.4% of the $3.3 billion merger consideration. If instead the claim had a one-in-five shot, the potential recovery of $19 million (without interest) for the unaffiliated unitholders would be just 0.57% of the total merger value.").

25

As discussed earlier, to have standing, the plaintiff must plead a direct claim. Under *Parnes*, to plead a direct claim, the plaintiff must allege that the merger itself was unfair, "by charging the directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price."[66] When the court is faced with a post-merger claim challenging the fairness of a merger based on the defendant's failure to secure value for derivative claims, we think that the *Primedia* framework provides a reasonable basis to conduct a pleadings-based analysis to evaluate standing on a motion to dismiss.

First, the court must decide whether the underlying derivative claims were viable, meaning they would survive a motion to dismiss. Meritless derivative claims would have no impact on the merger price. Second, the derivative claim recovery as pled must be material in relation to the merger consideration. An immaterial derivative claim would have little or no impact on the merger price. For example, a $10 million derivative claim could not reasonably be expected to be material to a $1 billion merger value. The same derivative claim would be material to a $20 million merger. And finally, the court should also assess whether the complaint alleges that

---

[66] *Parnes*, 722 A.2d at 1245.

26

the acquirer would not assert the underlying derivative claim and did not provide value for it.[67]

When assessing standing at the motion to dismiss stage of the proceedings, the court must accept the plaintiff's factual allegations as true and draw all reasonable inferences in his favor. This does not mean that the court is bound by unreasonable, unsupported, or speculative derivative suit damages claims. But if it is reasonably conceivable that the plaintiff could recover the damages claimed in the complaint, the court must accept that allegation as true for purposes of the motion to dismiss for lack of standing.

Here, the parties do not dispute the viability of the derivative claim. Morris's derivative claim survived a motion to dismiss. The parties also did not dispute that SEP GP secured no value for the derivative claim, and Enbridge would not assert the claim post-merger. Regarding materiality, Morris alleged that his derivative claim could lead to a more than $660 million damages award, including prejudgment interest, which was material when compared to a $3.3 billion merger.[68] The court could reasonably infer that if Morris prevailed on his challenge to the reverse dropdown transaction, Morris could recover at least $660 million.

---

[67] *Primedia*, 67 A.3d at 483. The rationale for this prong is that "[w]ithout such allegations and the resulting inferences, the merger consideration logically would incorporate value for the litigation, and the merger would not have harmed the sell-side stockholders." *Id.*

[68] App. to Opening Br. at A0023 (Compl. ¶ 1 & n.3) (describing the derivative claim that survived the motion to dismiss as "potentially worth more than $660 million to SEP (and more than $110 million to SEP's public unitholders)").

The court, however, discounted the potential $660 million recovery to $112 million to reflect the minority unitholders' 17% beneficial interest in the derivative litigation recovery. The Court of Chancery then reduced the $112 million further to account for litigation risk because it was still "a litigable question whether Reduced GP Cash Flow represented value to the Partnership in the Reverse Dropdown, which would vindicate the Defendant's approval of the transaction objectively."[69] The court also held that even if SEP GP's valuation was incorrect, it would not breach the limited partnership agreement because Morris would still have to prove "the work of the Defendant's advisor, Simmons, on the Reverse Dropdown did not fit in the parameters of Section 7.10(b) of the Second A&R LPA."[70] The court observed that Morris would have to demonstrate that "SEP GP did not 'reasonably believe' that the valuation of the transaction was within Simmons' competence, negating any 'safe harbor' for the Defendant."[71] Finally, Morris would also "have to demonstrate the Defendant's subjective bad faith to recover damages on behalf of SEP . . . ."[72] Taking these difficulties into account, the court concluded:

> I find that the chance of success of the Derivative Claim was slim, and certainly less than one-in-four. Twenty-five percent of $112,370,000 is $28,092,500. This represents less than one percent of the total value of the Roll-Up. One percent is not material in the context of the Roll-

[69] *Morris*, 2019 WL 4751521, at *13.
[70] *Id.*
[71] *Id.*
[72] *Id.* at *14.

28

Up. The Plaintiff consequently does not have standing to pursue his claims.[73]

We see two errors in the court's materiality analysis at the motion to dismiss stage of the proceedings. First, as discussed earlier, the court must accept Morris's factual allegations as true and draw all reasonable inferences in his favor.[74] In its prior decision the court found that Morris's complaint "made adequate allegations showing that under reasonably conceivable circumstances a facially unreasonable gap in consideration exists sufficient to infer subjective bad faith."[75] Thus, "it was 'reasonably conceivable that the General Partner acted in subjective bad faith.'"[76] It was also reasonably conceivable that, had Morris succeeded in the derivative suit challenging the reverse drop down transaction, the recovery could have been at least $660 million. Applying a further litigation risk discount at the pleading stage was inconsistent with the court's standard of review on a motion to dismiss for lack of standing.

Second, even if it was proper to discount the $660 million in damages alleged in the complaint to reflect the public unitholders' interest in the derivative recovery,

---

[73] *Id.* (footnotes omitted).
[74] *See Parnes*, 722 A.2d at 1247 (finding that, after taking all pleaded facts as true and drawing reasonable inferences in the plaintiff's favor, the plaintiff's claim was direct and withstood dismissal); *Primedia*, 67 A.3d at 479 ("Assuming these allegations are true, as I must at this procedural stage, . . . .").
[75] *Morris,* 2019 WL 4751521, at *5 (quoting *Morris v. Spectra Energy Partners (DE) GP, LP*, 2017 WL 2774559, *16 (Del. Ch. June 27, 2017)).
[76] *Id.*

to maintain equivalence, the court should have compared the $112 million *pro rata* interest in the derivative claim recovery to the public unitholders' proportional interest in the merger consideration. The public unitholders had a 17% interest in SEP. The merger consideration was valued at $3.3 billion. An apples-to-apples comparison would have compared $112 million to $561 million.[77] Under this calculation, the derivative claim was material at the motion to dismiss stage.

Neither *Massey* nor *Primedia* require a different result. As discussed earlier, in *Massey* the plaintiffs alleged in their complaint *Caremark* damages equal to the damages that the company suffered from the mining disaster—estimated to be $900 million to $1.4 billion. Even though the plaintiffs pled a viable *Caremark* claim, the court refused to equate the value of the *Caremark* claim with the damages suffered from the mine explosion. Unlike here, where Morris is entitled to certain presumptions in his favor, the court made its assessment as part of a preliminary injunction motion, where likelihood of success is one of the requirements. The court properly took into consideration the substantive difficulties confronting the plaintiff in proving and collecting on their *Caremark* claims. On an extensive record before the court, it predicted that the best-case recovery was $95 million, based not on the

---

[77] *See Primedia*, 67 A.3d at 482–83 (after finding the $190 million *Brophy* claim material to the $316 million merger, the court also discounted the *Brophy* claim's recovery to $80 million to reflect the stockholders' beneficial interest in the litigation recovery and compared it to the stockholders' $133 million *pro rata* share of the merger consideration).

full damages caused the company by the mine disaster but on the policy limits for directors' and officers' insurance coverage. The plaintiff did not show a likelihood that it would succeed on its challenge to the fairness of the merger for failing to secure value for a $95 million derivative claim recovery as part of a $8.5 billion merger.[78] Importantly, the court did not apply a percentage reduction based on litigation risk. Instead, on a substantial record, the court gave the plaintiffs the benefit of their realistic, best-case recovery.

*Primedia* is also distinguishable. The court in *Primedia* found that the plaintiffs' *Brophy* claim was material and did not face the same impediments to recovery as the plaintiffs faced in *Massey*. It was only after the court found that the plaintiffs had a strong and material derivative case that the court concluded its analysis with what can be best characterized as confirmation of its materiality conclusion. The court stated that even if the *Brophy* claim "was a toss-up, or even a 1–in–5 proposition, the risk-adjusted, pre-interest recoveries for the minority of $40 million and $16 million, respectively, remain material when compared to their $133 million share of the proceeds from the Merger."[79] As we interpret the court's percentage risk adjustment, it served only as a hypothetical to illustrate the strength and materiality of the plaintiffs' claims even if there were obstacles to recovery.

---

[78] *In re Massey Energy Co.*, 2011 WL 2176479, at *28–29.
[79] *Primedia*, 67 A.3d at 483.

In any event, on a motion to dismiss for lack of standing, we are not addressing the likelihood of success on a preliminary injunction record. A percentage-based risk reduction should not be applied at this stage of the proceedings. If the plaintiff has alleged a viable derivative claim, where it is reasonably conceivable that the claim is material when compared to the merger consideration and could result in the damages pled in the complaint, the plaintiff has satisfied the materiality requirement at the motion to dismiss stage for standing purposes. Morris has met this standard and his claims should not be dismissed for lack of standing.

## III.

Standing is concerned "only with the question of *who* is entitled to mount a legal challenge and not with the merits of the subject matter in controversy."[80] If the court finds that the plaintiff has standing, on the defendant's motion the court should also consider a motion to dismiss for failure to state a claim. For the first time on appeal, SEP GP has asked us to consider its motion to dismiss for failure to state a claim. Because the record is complex and it is not clear what has been incorporated by reference, we think that the Court of Chancery should consider the motion first. It also might be a better use of the court's scarce resources to consider a motion for summary judgment, after the completion of discovery, rather than a motion to

---

[80] *Dover Historical Soc'y*, 838 A.2d at 1110 (emphasis in original) (quoting *Stuart Kingston*, 596 A.2d at 1382).

dismiss.  But we leave it to the Court of Chancery's discretion.  We reverse the Court of Chancery's judgment and remand for further proceedings.  Jurisdiction is not retained.